## Illinois Central Railroad Company v. Dennington, By et al.

(Decided November 22, 1916.)

### Appeal from Lyon Circuit Court.

1.  False Imprisonment—Evidence—Question for Jury.—In an action for damages for false arrest and imprisonment, evidence considered and held that the question whether or not the officer making the arrest had reasonable grounds to believe that plaintiff had committed a felony was for the jury.

2.  False Imprisonment—Damages—Measure of Damages—Instruction.—In an action for damages for false arrest and imprisonment,

an instruction authorizing a recovery of damages for physical suffering is erroneous, where no physical suffering is shown.

JOHN C. GATES, BLEWETT LEE, R. V. FLETCHER and TRABUE, DOOLAN & COX for appellant.

UTLEY & UTLEY for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Reversing.

Russell Dennington, an infant, suing by J. H. Dennington, as next friend, brought this suit against the Illinois Central Railroad Company to recover damages for false arrest and imprisonment. The trial before a jury resulted in a verdict and judgment in his favor for $500.00. The railroad company appeals.

It appears that shortly after the noon hour on March 14th, 1914, the locomotive drawing a fast passenger train was derailed near a station called "Iron Hill," in Lyon County. Immediately after the train was stopped a passenger found an iron bolt lying on the track between the rails. The bolt was bent and bore the imprint of the flange of the locomotive wheel, and was flattened on the other side by contact with the top of the rail. Those present further found a mark on the rail. On the Monday following plaintiff was arrested on the charge of wrecking the train by Otto Hamilton, defendant's special agent, and taken to Kuttawa to the office of the town marshal, where he executed bond. On his examining trial before the county judge he was held over to the grand jury. The grand jury failed to indict. Thereupon this suit was brought. While the trial was in progress the grand jury brought in an indictment against plaintiff. Owing to the illness of one of the jurors, there was a mistrial. Subsequently the indictment was dismissed.

It further appears that plaintiff lived with his father, J. H. Dennington. In addition to plaintiff, the latter's family consisted of his wife, a grown daughter and a son two years younger than plaintiff. Their home was located at Iron Hill, near the defendant's track. A few yards from the track was a plant bed, which plaintiff and his younger brother were engaged in burning. Otto Hamilton, the road's special agent, was notified of the wreck, and in a short time came upon the scene. After

some investigation he found boys' tracks leading from
the plant bed down the embankment towards the rail-
road. This caused him to suspect the boys. Thereupon
he came to the plant bed and began to question the boys
in regard to the matter. Before detailing what then
occurred, it will be best to state that, according to the
evidence of the father, mother and sister of the boys,
and of the boys themselves, the two boys went to work
at the plant bed early Saturday morning. They were
accompanied by their father, who soon returned to the
house and left for Kuttawa for the purpose of buying
some groceries. He told their mother to have the boys
meet him on his return at a point on the "old cinder
road," about one mile distant, and help him carry the
groceries home. Between eleven and twelve o'clock
their mother went to the plant bed and told the boys
to go to meet their father. Accompanying the mother
was her grown daughter, who carried a dinner which
the mother had prepared for a sick neighbor. The boys
started towards the track for the purpose of meeting
their father. They were accompanied by their sister.
While standing there a freight train passed. Then the
daughter and the boys went across the track together.
The mother stood and watched them until they had pro-
ceeded some distance beyond the place of the wreck.
After going some two hundred or three hundred yards
the boys separated from their sister and proceeded on
their way to the cinder road. While there the boys got
into a fight. A little before one o'clock their father ar-
rived at the meeting place. They then returned to the
house, and while crossing the track at the scene of the
wreck they observed marks showing that there had been
a derailment. After dinner the boys went to the plant
bed. While at work there the special agent appeared.
According to the testimony for plaintiff, he asked the
boys if they knew anything about the wreck and they
told him that they did not. He drew his pistol and
asked them if they knew what it was. He also displayed
his detective badge and inquired if they knew what that
was. He then told them that he was a railroad detec-
tive. After some discussion he took the smaller boy
aside and talked with him. He then took plaintiff aside
and talked with him for quite a while. In this conver-
sation he told plaintiff that Albert, the younger boy,
had confessed that they did it. Plaintiff insisted that

he knew nothing about it. Albert says that he made no such statement to Hamilton. He then told plaintiff that if he would say he did it, it would amount to nothing; that he would take plaintiff to Paducah and buy him a fine suit of clothes and give him employment with the railroad. After staying there some time discussing the matter, Hamilton left. He returned on Monday morning and went to the home of the boys. He was accompanied by an officer by the name of Hammond. There he met their mother and sister, who explained that the tracks down the embankment were made by the boys when they went to meet their father; that they were all present when the freight train passed and that after it passed the boys proceeded on their way and did not place the bolt on the track. Hamilton and Hammond then proceeded to the home of Mr. Pendergrass, where plaintiff was at work. Plaintiff's testimony as to what occurred there is as follows:

"Q. What did Mr. Hamilton say when he came up? A. Mr. Hamilton said 'Good morning,' and I said 'Good morning,' and he said, 'Now, son, I come down here to get the straight tale of that,' and I said, 'You got that Saturday evening,' and he said, 'No; you told me a pack of lies Saturday evening, and the best thing for you to do is to come on and say you done this, and that will be the last of it,' and I said, 'No; I don't know nothing about it,' and he said 'I am satisfied you are the one that put something on the track,' and I said, 'No; I never,' and we kept on arguing a while, him arguing that I did and me arguing that I never, and he said, 'Now, son, if you will say you did put something on the track I will get you a job in Paducah at $30 or $35 a month (I forget which), and pay your way to Paducah, and get you a new suit of clothes, if you will say you put something on the track,' and I told him no, I wouldn't do it, and he stayed there it seemed to me like about a couple of hours; I don't know how long it was, but 102 run, though, just after we got to town. I told him to go on away, I didn't know nothing about it, I wanted to go to work, and he said, 'If you will say you put something on the track I will go on away.' Mr. Pendergrass was standing off a little piece from me, and I said, 'Mr. Pendergrass you heard that?' and he said, 'Yes,' and I said then, 'Yes, I did,' and he said 'Tell me the reason why,' and I didn't know what to say,

and he said, 'If your little brother was the cause of it tell how he was the cause of it,' and I said, 'I first·put something on the track and kicked it off, and he said I wasn't game, and I went and put it on,' and I told the detective that and he said, 'Well, let's go to town,' and I said, 'Well, you didn't do what you said you would. You ain't the kind of man I thought you was. I thought you was a man of your word,' and he said, 'Don't go to saying I ain't a man of my word,' and I said, 'You ain't. You didn't do what you said you would,' and he said, 'If you had come on and said it right without me having to twist it out of you with this stick I wouldn't have bothered you,' and he took me on to town. Q. Did he take hold of you? A. No, sir. Q. How did he take you to town? A. In Mr. Pendergrass' wagon. Q. Anything said between you and him about wanting to go on with your work? A. Yes, sir. Q. What was it? A. I told him I wanted to go on with my work. Q. What did he say to that? A. He said if I would. tell him I put something on the track I could go on to work and there would be nothing else to it. Q. That was what you told him? A. Yes, sir. Q. What was said then, if anything? A. He called Mr. Hammond. Q. What did he say to Mr. Hammond? A. He says, 'This boy says he done it. Let's go to town.' Q. What did you say then? A. I don't remember. Q. Did Mr. Pendergrass go to you? A. Yes, sir. Q. What occurred there after Mr. Pendergrass came down? Did you say anything to them about what you had told him? If, so, what was it? A. I told Mr. Pendergrass that Mr. Hamilton said if I would tell him that I did do that he would go away and let me alone, and now— Q. Mr. Pendergrass heard you say it? A. Yes, sir; he heard me say that. Q. Did you deny that you had said that? A. No, sir; he listened to me tell it.''

On cross-examination plaintiff repeated substantially the above statements. Plaintiff further testified that when Mrs. Pendergrass came down to inquire about the trouble Hamilton told her that plaintiff had put something on the rail. Mr. Pendergrass, a witness for plaintiff, after stating that someone called him to hear what Russell said, made the following statement of what took place:

"Q. What was said then? A. Well, sir, Mr. Hamilton got the boy to relate what he had promised, that he had put a little piece of iron on the road, a little piece of iron,

marked on his hand, but I don't exactly recollect what was said about it, but anyhow, something was said about taking him to town, and Russell commenced crying and said, 'You have told me a lie. You agreed to turn me loose,' and that gentleman said, 'Yes, you told it after I took this stick and twisted it out of you, and if you don't shut up I will take this stick and pestle hell out of you.' I don't remember all that was said about it. Q. To refresh your recollection, isn't it a fact that Russell called you to hear what Mr. Hamilton said to him, and then told you that if he would say he did it that he would let him alone and let him go on to work? A. Maybe something said about it. Q. Then Hamilton called your attention to that? A. Yes, sir."

He further stated on cross-examination that plaintiff told Hamilton that he did put a piece of iron on the track. After this conversation Mr. Pendergrass' wagon was hitched up and the two boys, together with the officers and Mr. Pendergrass, started towards Kuttawa. On the way someone suggested that they tell the boys' father of what had taken place. The father was at Oscar Yates' farm. When the party approached the father came to the road. Plaintiff says that Hamilton then told his father that plaintiff had placed the obstruction on the track and he was going to take plaintiff to town for trial. Plaintiff gave his father his clothes and his father said he guessed he wouldn't go to town. Plaintiff did not remember what his father said in response to Hamilton's remark. Mr. Pendergrass testified that there was something said about the confession and Mr. Dennington said he was not going to help the boys out if they had done anything like that. During this conversation plaintiff never said anything. After leaving the Yates farm the party proceeded to Kuttawa. Plaintiff was turned over to W. H. McCollum, the town marshal. Shortly thereafter Hamilton and Hammond left for Princeton. When plaintiff was turned over to McCollum plaintiff says that Hamilton informed McCollum that he had found out that plaintiff had put something on the track. Thereafter plaintiff had a conversation with McCollum. McCollum told plaintiff that the best thing he could do was to say that he put the bolt on the track but didn't mean any harm by it. At the same time McCollum said he had put little pieces of iron on the track from town to Andy Richardson's, but didn't

mean any harm by it.  On the cross-examination plaintiff says that he first told McCollum that he didn't do it. After McCollum advised him to tell the truth and said he didn't mean anything by it, and after McCollum had told him about his putting things on the track, plaintiff told him that he put a piece of iron on the track.

According to the evidence of Hamilton, the special agent, he was led to suspect the boys because of their demeanor and the tracks leading from the plant bed. After interviewing the father of the boys the father stated that he didn't believe the younger boy had anything to do with it, but that he wouldn't "put it past" the older boy.  On the Monday following, plaintiff admitted that he placed the iron bolt on the rail and kicked it off.  His brother Albert told him that he wasn't game and to put it back and leave it there.  Pendergrass, who was standing nearby, was called and plaintiff repeated the confession to Pendergrass.  Hamilton denied making any promises or threats to induce the confession. He admits, however, telling the boy that he always tried to help a truthful boy, and if it ever happened that he could get him a job he would be glad to do so.  Hammond testified that after Hamilton had called him and Pendergrass he heard plaintiff say that he placed the bolt on the track and kicked it off, and that his brother said "You are a dirty coward if you don't put the bolt back on there."  Plaintiff then put the bolt on a few minutes before the train was wrecked.  Hamilton further says that when the father was informed of plaintiff's confession he asked plaintiff if it was true, and plaintiff replied in the affirmative.  After plaintiff had stated to McCollum that he placed the bolt on the track, McCollum sent for W. T. Gaines, plaintiff's uncle. Gaines says that when he came to McCollum's office McCollum said to plaintiff, "Now, Russell, you state to your Uncle Will just what you have stated to us."  In answer to the question, "What did he say?" witness used the following language:  "Well, he said that he and Albert were down there on the railroad, and they heard the train coming, and Russell put a bolt on the track, I suppose that long, I don't know; I might have seen the bolt, I don't know.  But anyhow he said they put a bolt on the track and the train come up pretty close and he kicked it off, and Albert said he was a coward if he didn't pick it up and put it back on, which he did,

he said. Then they went on across over there to the public road in that direction, and they stopped and had a fight.'' The witness further stated that McCollum did not make any promises or threats, or do anything to intimidate the boy; that the boy did not seem to be frightened. Other witnesses testified that plaintiff confessed to them that he had placed the bolt on the track.

A private person may make an arrest, when he has reasonable grounds for believing that the person arrested has committed a felony. Section 37, Civil Code. A peace officer may make an arrest in obedience to a warrant of arrest delivered to him, or without a warrant, when a public offense is committed in his presence, or when he has reasonable grounds for believing that the person arrested has committed a felony. Section 36, Civil Code; Wright v. Commonwealth, 85 Ky. 123, 2 S. W. 904. Under our statutes, the placing of an obstruction on a railroad track, whereby any engine or car might be upset, or thrown from the track, is a felony. Kentucky Statutes, section 807. In this case the arrest was made without a warrant, and the question is, did the officer making the arrest have reasonable grounds to believe that plaintiff had committed a felony by placing the bolt on the track? Defendant insists that as the wreck was caused by the bolt on the track and the officers discovered tracks leading from the plant bed where the boys were at work to the railroad track, and as plaintiff subsequently confessed to the officer that he placed the obstruction on the track and repeated his confession in the presence of others, the trial court should have held, as a matter of law, that the officer had reasonable grounds to believe that plaintiff had committed a felony and should have sustained defendant's motion for a peremptory. While, ordinarily, of course, a confession will furnish probable cause for making an arrest, there may be cases where the arrest is made under such circumstances as to discredit the good faith of the officer making the arrest. It must not be forgotten that we are here dealing with the case of a boy who lacked a few months of being fourteen years of age, and for the purposes of a peremptory we must assume that his testimony and that of his witnesses are true. According to their testimony, the officer spent some time trying to persuade plaintiff to confess. To induce the confession he told him that his younger brother had confessed. On

the same occasion he exhibited his badge of authority, displayed and flourished his pistol and announced that he was a detective. He spoke of taking plaintiff to jail or the reform school. He told plaintiff that if plaintiff would say that he did it, he would give plaintiff a suit of clothes and procure him employment with the railroad. He returned the following Monday and was told by plaintiff's mother and sister how the tracks leading to the railroad came to be there, and was further told that plaintiff could not have placed the obstruction on the track. He then went to the Pendergrass farm, where plaintiff was at work. There he again repeated his promise to buy plaintiff a suit of clothes and procure him employment with the railroad. He himself admits that he told plaintiff that he always liked to help a truthful boy, and if it ever happened that he could get plaintiff a job, he would be glad to do so. He also told plaintiff, who was afraid that he would be taken to jail, that if plaintiff would say that he did it, that would be the last of it and plaintiff could go on with his work. With the fear that if he did not confess he would be taken to jail, and under the promise that if he did confess that would be the end of it, plaintiff called on Mr. Pendergrass to witness the agreement and then made the confession. Thereupon the officer repudiated the agreement and made the arrest and threatened to "pestle hell" out of plaintiff with a stick which he had in his hands.

Considering the case in the light of the fact that plaintiff was a mere boy, and of the fear and anxiety which, not only the presence of the officer but the thought of going to prison, would naturally excite in his mind, and in the light of the intimidation, threats, promises, inducements and subterfuges employed to obtain a confession, we are unable to say, as a matter of law, that the officer acted in good faith in making the arrest, but conclude that the facts and circumstances are such that honest and intelligent men might reasonably differ as to the conclusion to be drawn from them, and that the question whether or not he had reasonable grounds to believe that plaintiff had committed a felony was properly submitted to the jury. It follows that the trial court did not err in refusing the peremptory asked for by defendant.

The instruction on the measure of damages authorizes a finding of damages for both mental and physical

suffering. It does not appear that plaintiff's arrest was accompanied by unnecessary force, or that, while being detained, he was subjected to any bodily suffering or physical pain. Under the circumstances, therefore, damages for physical suffering were not recoverable, and the instruction on the measure of damages was erroneous. Keiner v. Collins, 161 Ky. 696, 171 S. W. 399; C. N. O. & T. P. Ry. Co. v. Cecil, 164 Ky. 377, 175 S. W. 654. While admitting this to be true, it is suggested by counsel for plaintiff that, in view of the size of the verdict, the error was not prejudicial. In our opinion, however, the case is a close one, and we are not prepared to say that the jury awarded no damages for physical suffering, but conclude that the judgment should be reversed for the error referred to.

In view of the above conclusion, it is unnecessary to determine whether plaintiff's counsel, in his address to the jury, exceeded the bounds of legitimate argument.

Judgment reversed and cause remanded for a new trial consistent with this opinion.